**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

JOSEPH SOLIMAN, Individually and on behalf of all others similarly situated,

      Plaintiff,

v.

FUSIONPHARM, INC.,
SCOTT M. DITTMAN, and
WILLIAM J. SEARS,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS**

---

      Plaintiff Joseph Soliman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters from the investigation conducted by and through Plaintiff's attorneys. The investigation includes, without limitation, a review of the following: defendants' public documents; conference calls and announcements made by defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding FusionPharm, Inc. ("FusionPharm" or the "Company"); analysts' reports and advisories about the Company; and information readily obtainable from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants (and others described below) who purchased or otherwise acquired FusionPharm securities between  March 31, 2012 and May 16, 2014, both dates inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      FusionPharm presented itself to the investing public as a company focused on the development, production and sales of its "patent pending PharmPods cultivation container system," which are refurbished shipping containers used primarily to grow cannabis.  Throughout the Class Period, FusionPharm's stock traded over-the counter ("OTC") and was quoted on OTC Link, operated by OTC Markets Group, Inc.

3.      Throughout the Class Period, defendants caused the Company to issue materially misleading statements and/or omit material information regarding the Company's purported revenues.  In particular, defendants engaged in a fraudulent scheme by utilizing backdated convertible notes and preferred FusionPharm stock in order to cause the Company to issue common stock to entities owned and/or controlled by defendant William J. Sears ("Sears") (the brother-in-law of the Company's Chief Executive Officer ("CEO"), defendant Scott M. Dittman), including Microcap Management LLC ("Microcap"),[1] Bayside Realty Holdings LLC ("Bayside") and Meadpoint Venture Partners, LLC ("Meadpoint").  Defendant Sears would then cause the entities he controlled – Microcap, Bayside and Meadpoint – to sell the FusionPharm common

---

[1]      In 2009, Microcap received common shares from FusionPharm's predecessor company for stock promotion work.  In 2010, Microcap received preferred shares as part of the transfer of the predecessor company to defendant Dittman and Sears.  In 2011, Microcap purchased FusionPharm common shares from an individual FusionPharm shareholder.

shares those entities received to the investing public with some of the proceeds round-tripped back to the Company.   Defendants caused the Company's stock price to be artificially inflated throughout the Class Period by reporting the fraudulent stock sales as revenue from the sale of the Company's PharmPods.

4.     The Company was started in late 2010, when defendants Dittman and Sears acquired Baby Bee Bright Corp. ("Baby Bee Bright"), a company that purported to manufacture and sell prenatal audio systems which the Baby Bee Bright claimed to enhance the cognitive development and intelligence of babies.   Defendant Dittman and his brother in-law, defendant Sears, changed Baby Bee Bright's name to FusionPharm in March 2011.   Defendant Dittman was listed as the CEO of the Company and FusionPharm's sole director.

5.     Upon information and belief, defendant Sears was an undisclosed executive officer of the Company and controlled the entities that received FusionPharm's common stock during the Class Period, which was then sold to the investing public.   According to cease-and-desist orders (*see infra* notes 2-7) by the SEC against defendants, defendant Sears worked at FusionPharm from its inception, appeared on non-public Company documents as an officer, drew a paycheck, and handled many day-to-day responsibilities usually reserved for an officer of the Company.

6.     Defendants Dittman and Sears did not disclose Sears' controlling position and receipt of salary from the Company because defendant Sears was a convicted felon, having pled guilty to conspiracy to commit securities fraud, securities fraud, and commercial bribery, in 2007. *See United States v. Sears*, Case No. 04-cr-556-swk (S.D.N.Y.).

7.     Although FusionPharm reported that it was ostensibly in the business of selling PharmPods, it had almost no real revenue and the lion's share of the revenue reported by the Company was a product of the fraudulent scheme described herein.   Throughout the Class Period,

FusionPharm was funded almost entirely through illegal sales of the Company's stock through defendant Sears' controlled entities, beginning with the initial stock that Sears received through his ownership in Microcap.

8.     Defendants Dittman and Sears then caused the Company to falsely report that Bayside and Meadpoint, entities controlled by defendant Sears, had loaned money to FusionPharm in order to make the sales of FusionPharm stock by defendant Sears appear to be legitimate.  After defendants sold the initial stock Sears' entities had received, Sears then converted the purported "loan" – or fake "debt" – owed to Bayside and Meadpoint to unrestricted FusionPharm stock, which Bayside and Meadpoint turned around and sold to the investing public.

9.     Portions of the proceeds of the sales by Bayside and Meadpoint were then given back to the Company and defendants caused FusionPharm to report those proceeds from the fraudulent stock sales as revenue from the sales of PharmPods.  As such, the Company's share price was artificially inflated during the Class Period when defendants engaged in the fraudulent scheme to sell the Company's stock through defendant Sears' controlled entities.

10.    In furtherance of the fraudulent scheme, defendants caused the Company to report false information concerning the purported loans, and to omit material information regarding defendant Sears' role in FusionPharm as well as his control over the entities receiving FusionPharm stock in exchange for the purported fake "debt."  The Company also failed to disclose that the transactions with these entities were related party transactions due to defendant Sears' affiliation with FusionPharm.

11.    Defendant Sears, through the entities he controlled, sold the FusionPharm stock into the market, reaping millions in fraudulent proceeds.  Defendant Sears then transferred the proceeds from the illegal stock sales back to the Company, where the money was fraudulently

recognized and reported as revenue in the Company's financial reports to the investing public.  To further artificially inflate the Company's stock price, defendants caused FusionPharm to issue press releases and financial reports claiming the false revenues, and failed to disclose defendant Sears' identity, role, and background in FusionPharm's quarterly and annual reports posted on the OTC Markets Group, Inc.'s website for investors to know the truth concerning the reported revenues.  During the Class Period, defendants' fraudulent scheme defrauded shareholders of approximately $12.2 million.

12.     The truth concerning defendants' wrongdoing began to emerge on May 16, 2014, when the SEC issued an Order of Suspension of Trading and suspended FusionPharm from trading on OTC Link for the period May 16, 2014 through May 30, 2014 (the "Suspension Order").[2]  The Suspension Order stated the reason for the suspension of trading against FusionPharm was due to "a lack of current and accurate information concerning the securities of FusionPharm…in filings and disclosures made by FusionPharm on OTC Link…and press releases to investors concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition."

13.     On this news, the Company's stock plummeted from $2.89 per share at the close of trading on May 15, 2014, the day prior to the issuance of the Suspension Order, to close at $1.10 per share on June 2, 2014, when the Company was allowed to resume trading, a loss of approximately 62% on heavy volume of 767,739 shares.

14.     On or about September 16, 2016, the SEC instituted cease and desist proceedings

---

[2]      *In the Matter of FusionPharm, Inc.*, File No. 500-1 (May 16, 2014) (Order of Suspension of Trading), *available at* https://www.sec.gov/litigation/suspensions/2014/34-72177-o.pdf.

against FusionPharm,[3] Scott M. Dittman,[4] William J. Sears,[5] Cliffe R. Bodden,[6] Tod A. DiTommaso ("DiTommaso"),[7] Microcap Management LLC, Bayside Realty Holdings LLC and Meadpoint Venture Partners, LLC,[8] in connection with defendants' scheme defraud investors through false and misleading statements concerning the Company's purported loans, sales of the stock and reported revenue during the Class Period, as well as the omissions of defendant Sears' controlling role in the scheme.

15.    In connection with the federal criminal charges filed against defendants Sears and Dittman relating to the findings of the SEC cease-and-desist orders, defendant Sears pled guilty and was convicted of conspiracy [18 U.S.C. § 371] to commit violations of Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)], violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], wire fraud [18 U.S.C. § 1343], and mail fraud [18 U.S.C. § 1341]. *See United States v. William Sears and Scott Matthew Dittman*, 16-CR-301-WJM (D. Colo.).  Defendant Sears agreed, as part of a plea agreement, to a minimum of 60 months in prison, a money judgment of over $12 million, and the forfeiture of over $45 million

---

[3]    Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order and Notice of Hearing, Securities Act Release No. 10210, Exchange Act Release No. 78863 (Sept. 16, 2016).

[4]    Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 4C, 15(b) and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order and Notice of Hearing, Securities Act Release No. 10211, Exchange Act Release No. 78864 (Sept. 16, 2016).

[5]    Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order and Notice of Hearing, Securities Act Release No. 10212, Exchange Act Release No. 78865 (Sept. 16, 2016).

[6]    Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order and Notice of Hearing, Securities Act Release No. 10214, Exchange Act Release No. 78867 (Sept. 16, 2016).

[7]    Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 9133 and Notice of Hearing, Securities Act Release No. 10215 (Sept. 16, 2016).

[8]    Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order and Notice of Hearing, Securities Act Release No. 10213, Exchange Act Release No. 78866 (Sept. 16, 2016).

including funds maintained by Sears in FusionPharm and Meadpoint bank accounts.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as FusionPharm maintains its executive offices in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

20.     Plaintiff Joseph Soliman ("Plaintiff"), as set forth in the accompanying certification, incorporated by reference herein, purchased FusionPharm stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Defendant FusionPharm is a Nevada corporation with its principal executive offices located at 355 South Teller Street, Suite 200, Lakewood, CO 80226.

22.     Defendant Scott M. Dittman ("Dittman") founded the Company and was the Chief

Executive Officer ("CEO"), President and purported sole director of FusionPharm during the Class Period.  Defendant Dittman signed and/or authorized the signing of the false and misleading financial statements described herein.

23.     Defendant William J. Sears ("Sears"), upon information and belief, during the Class Period was a founder, de facto executive officer and undisclosed control person of FusionPharm. Upon information and belief, defendant Sears controls Microcap, Bayside and Meadpoint.

24.     Defendants Dittman and Sears are collectively referred to herein as the "Individual Defendants."

25.     The Individual Defendants and defendant FusionPharm are collectively referred to herein as the "defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

26.     The Company was started in late 2010 when defendants Dittman and his brother in-law, Sears, took over Baby Bee Bright, an over-the-counter ("OTC") traded company.  Baby Bee Bright reported $400 in gross revenues for the first quarter of 2010 (its final quarter of operations), and a $25,000 loss, for its business of purportedly manufacturing and selling prenatal audio systems the company claimed enhanced babies' cognitive abilities.  After drawing the attention of the Federal Trade Commission ("FTC"), Baby Bee Bright was forced to cease any representations that its prenatal audio system provided cognitive development and educational benefits to babies.[9]  Upon information and belief, once the FTC forced Baby Bee Bright to halt its false claims of product efficacy, the company was unable to attract investors' capital, and thereafter

---

[9] *See* Letter from Heather Hippsley, Acting Associate Director, Federal Trade Commission to Greg Lam, Esq., Copilevitz & Canter, LLC (Mar. 23, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/closing_letters/baby-bee-bright-corporation/090323babybeebrightclosing.pdf.

ceased operations. Baby Bee Bright was, in turn, proceeded by three other companies which operated in different business sectors and never produced a profit, including, Sequoia Interest Corp., Argent Capital Corp. and Sunport Medical.

27.     Defendants Dittman and Sears took over Baby Bee Bright and started operations of FusionPharm (the name change occurred in April 2011) in late 2010 working with attorney Guy Jean-Pierre as corporate secretary and Company counsel for Fusion Pharm. Jean-Pierre had been added to the OTC Markets Prohibited Attorneys list in early 2010, and has since been barred from practicing before the Commission. He has also lost his license to practice law and was ordered to pay a monetary penalty of over $2 million for his role in penny stock fraud scheme. Despite this, OTC Markets filings reflect that Jean-Pierre served as corporate secretary to FusionPharm until early 2012. The proceedings against Jean-Pierre arose after he was charged with forging more than 100 legal opinions for multiple penny stock issuers all of which had gone public in reverse merger transactions. Fusion Pharm made no disclosure to investors or its shareholders of the charges against Jean-Pierre.

28.     The Company claimed to be a business focused on commercializing its patent pending PharmPods line of hydroponic cultivation systems. PharmPods are intended to be used for indoor plant cultivation by urban farming companies and other specialty growers. According to the Company's website, a single 40-foot PharmPod container is capable of growing more produce than one full acre of traditional farm agriculture.

**Defendants Cause the Company to Issue Materially
Misleading Statements and/or Omit Material Information**

29.     The Class Period begins on March 31, 2012, when FusionPharm filed its annual report for the year ended December 31, 2011 (the "2011 Annual Report"). In the 2011 Annual Report, the Company reported the following:

**Results of Operation – January 1, 2011 to December 31, 2011**

During this period the Company's revenues were $256,895 with a gross profit of $111,880. Operating expenses during the period were $308,747. Our net loss during the period was $287,564.

30.     In connection with the Company's outstanding securities, the 2011 Annual Report

stated:

**Increases of 10% or more of the same class of outstanding equity securities:**

(a)  Approximately 889,600 shares of common stock were issued during the fiscal year covered by this Annual Report for the conversion of preferred stock.

(b)  The Issuer sold at total of 165,918 shares of common stock to 7 individuals during the fiscal year covered by this Annual Report.

(c)  Approximately 194,224 shares of common stock were issued during the fiscal year covered by this report in settlement of debt.

31.     In connection with related party transactions, the 2011 Annual Report stated:

**Disclosure of Related Party Transactions**

None of the following parties has, during the past two fiscal years, had any material interest, direct or indirect, in any transaction with us or in any presently proposed transaction that has or will materially affect us, other than as noted in this section:

(i)  Any of our directors or executive officers;

(ii)  Any person proposed as a nominee for election as a director;

(iii)  Any person who beneficially owns, directly or indirectly, shares carrying more than 5% of the voting rights attached to our outstanding shares of common stock;

(iv)  Any of our promoters; and

(v)  Any member of the immediate family (including spouse, parents, children, siblings and in-laws) of any of the foregoing persons.

32.     The 2011 Annual Report was signed by defendant Dittman.

33.     On April 9, 2012, DiTommaso filed an attorney letter with OTC Markets Group,

Inc., which was published on April 10, 2012 to the investing public, and which stated that DiTommaso was retained by the Company to determine whether FusionPharm disclosed adequate current information in its financial reports, including the 2011 Annual Report.[10]

34.     On February 20, 2013, FusionPharm filed its annual report for the year ended December 31, 2012 (the "2012 Annual Report").  In the 2012 Annual Report, the Company stated, in pertinent part:

**Dependence on One or a Few Major Customers;**

The Issuer's largest customer, VertiFresh, accounted for approximately 90.8% of the Company's sales for the year ended December 31, 2012. In addition, the Company's two largest customers, VertiFresh and Meadpoint Venture Partners, together accounted for approximately 90.8% and 9.2%, respectively, of the Company's sales for such period.

*        *        *

**Meadpoint Venture Partners LLC**: In November 2012, the Company entered into Licensing and Distribution Agreement with Meadpoint Venture Partners, a Colorado company. Under the agreement Meadpoint has agreed to be the Company's primary distributor for the Company's PharmPod High Intensity line of controlled environment agriculture containers. PharmPod High Intensity containers utilize High Intensity Discharge (HID) and/or High Pressure Sodium (HPS) lighting systems to achieve outstanding results with fruiting and flowing plants. An initial order for 8 PharmPod High Intensity containers was received from Meadpoint with minimum purchase quantities of 50 containers in both 2013 and 2014.

35.     In connection with the Company's revenue for 2012, the 2012 Annual Report stated the following:

**Net Revenues**. *Net revenues for the year ended December 31, 2012 was $825,594, an increase of $598,155 (263.0%) as compared with $227,439 for the year ended December 31, 2011. Revenue was derived primarily from the sale of PharmPods and licensing fees.*

(Emphasis added.)

---

[10]     *See* Letter from Tod A. Ditommaso to OTC Markets Group, Inc. (Apr. 9, 2012), *available at* http://www.otcmarkets.com/financialReportViewer?symbol=FSPM&id=77659.

36.     The 2012 Annual Report further contained information concerning convertible promissory notes payable to third parties.  In particular, the 2012 Annual Report described an outstanding $175,547 Convertible Promissory Note payable to Bayside Realty Holdings, LLC, due on May 2, 2013, with a per annum rate of 10%.  This note was convertible into common stock at $0.01 per share.

37.     The 2012 Annual Report described a similar Convertible Promissory Note in the amount of $88,000 payable to Meadpoint Venture Partners, LLC, due on June 15, 2013, pursuant to the same terms as the note payable to Bayside Realty Holdings, LLC.

38.     In the 2012 Annual Report, the Company reported that during the year ended December 31, 2012, FusionPharm issued 619,000 shares of the Company's common stock for the conversion of 6,190 shares of preferred stock by Microcap Management, LLC.  The Company also issued 140,000 common shares for the conversion of $1,400 debt payable to Bayside Realty Holdings, LLC for the year ended December 31, 2012.

39.     The 2012 Annual Report was signed by defendant Dittman.

40.     On March 7, 2013, DiTommaso filed an attorney letter with OTC Markets Group, Inc., which was published that same day to the investing public, and which stated that DiTommaso was retained by the Company to determine whether FusionPharm disclosed adequate current information in its financial reports, including the 2012 Annual Report.[11]

41.     The 2011 and 2012 Annual Reports were materially misleading and/or omitted material information.  In particular, the 2011 and 2012 Annual Reports contained materially misleading statements and/or omitted material information concerning defendants Dittman's and Sears' scheme to prepare fraudulent non-convertible promissory notes and credit lines between

---

[11]     *See* Letter from Tod A. Ditommaso to OTC Markets Group, Inc. (Mar. 7, 2013), *available at* http://www.otcmarkets.com/financialReportViewer?symbol=FSPM&id=100536.

FusionPharm and Bayside, as well as between FusionPharm and Meadpoint.

42.     In June 2012, defendants Sears and Dittman prepared the fraudulent non-convertible promissory notes and credit lines.  In fact, the non-convertible note and credit line agreement with Bayside, which contained a credit limit of $275,000, was backdated to May 2, 2011 and the non-convertible promissory note and credit line agreement with Meadpoint, which contained a credit limit of $200,000, was backdated to June 15, 2011.

43.     Then, around November or December 2012, defendants Sears and Dittman re-drafted the Bayside and Meadpoint notes as fraudulent convertible notes, as described in the 2012 Annual Report.  Defendants Dittman and Sears fraudulently re-drafted these notes in order to obtain more unrestricted FusionPharm common shares, which they could then sell illegally to the unsuspecting public, using the proceeds to fund the Company and report as illegal revenue, as described in the 2011 and 2012 Annual Reports.

44.     Between approximately March 2011 and December 2012, Microcap sold approximately 735,000 shares of unregistered FusionPharm common stock. Microcap's sale of unregistered FusionPharm common stock was based on, among other things, the materially misleading statements in the 2011 and 2012 Annual Reports.  In particular, the 2011 and 2012 Annual Reports failed to disclose defendant Sears' undisclosed role as an executive officer of FusionPharm, as well as his control over Microcap.  Indeed, the sales were based on statements to the contrary, that defendant Sears had no role with the Company and was not an affiliate of Microcap.  Portions of the sales of the Company's common stock by Microcap were then funneled back into the Company and reported as fraudulent revenue from the sales of PharmPods which never occurred.

45.     On April 15, 2014, FusionPharm filed a restated annual report for the year ended

December 31, 2012, which also contained the Company's financial report for the year ended

December 31, 2013, and a supplemental disclosure statement for FusionPharm's fiscal year 2013

(collectively, the "Restated 2012 and 2013 Annual Reports").

46.     In the Restated 2012 and 2013 Annual Reports, the Company reported restated

revenue for fiscal 2012 of $308,398.  Concerning the restatement of the financial results contained

in the 2012 Annual Report, the Restated 2012 and 2013 Annual Reports stated, in pertinent part:

> In connection with the finalization of our 2013 financial statements, we have restated our 2012 financial statements to reverse $500,000 of the $750,000 in revenue that was recognized during 2012 for the previously reported exclusive licensing arrangement with VertiFresh LLC ("VertiFresh") for the use of PharmPods growing technologies for agricultural products. The restatement was based on reevaluating the arrangement with VertiFresh which required $250,000 be paid during 2012 for the licensing of the Colorado territory (on a nonrefundable basis), and the remaining $500,000 to be due in equal installments of $250,000 during 2013 and 2014 for the rights to two additional territories. The initial $250,000 was paid during 2012 and was reflected as earned revenue. The remaining $500,000 was set up as an accounts receivable and was reflected as earned revenue in error under US GAAP as the formal agreement was never finalized the amounts due were for future territories and therefore not earned during 2012 and collection of this amount was never reasonably assured given the startup nature of VertiFresh. No further payments are anticipated.

47.     The Restated 2012 and 2013 Annual Reports also contained information

concerning outstanding notes owed by the Company, as shown in the table below:

Notes Payable consists of the following as of:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Convertible Unsecured Promissory Note payable to Bayside Realty Holdings, LLC. Originally due May 2, 2013 – extended to March 31, 2014. This note bears interest at a rate of 10% and is convertible into common stock at $0.01 per share. | $30,703 | $175,547 |
| Convertible Unsecured Promissory Note payable to Meadpoint Venture Partners, LLC. Originally due June 15, 2013 – extended to June 30, 2014. This note bears interest at a rate of 10% and is convertible into common stock at $0.01 per share. | $63,250 | $88,000 |

| Unsecured Promissory Note. Due on demand. Non-interest bearing. | $26,205 | $26,205 |
|---|---|---|
| **Total Notes Payable** | **$120,158** | **$289,752** |
| Current Notes Payable | $120,158 | $26,205 |
| Long Term Notes Payable | $0 | $263,547 |

48.     Further, in connection with common stock issued by the Company, the Restated 2012 and 2013 Annual Reports stated, in pertinent part:

**Common Stock**

During the year ended December 31, 2013, we issued 3,157,265 shares of our common stock in connection with the conversion of $170,994 in debt payable to Bayside Realty Holdings, LLC ($146,244) and Meadpoint Venture Partners, LLC ($24,750).

During the year ended December 31, 2012, we had the following activity: we raised $68,000 from the sale of 68,000 shares of our common stock to various investors in a private placement; and we issued 12,000 shares of restricted common stock in exchange for professional services for which we recognized $12,000 of professional fee expense related to the issuance at the per share subscription price of our private placement then in effect.

**Preferred Stock**

During March of 2013, we issued 2,000,000 shares of common stock in connection with the conversion of 20,000 shares of Series A Convertible Preferred Stock. During 2012 we issued 619,000 shares of our common stock for the conversion of 6,190 shares of our preferred stock.

49.     The Restated 2012 and 2013 Annual Reports were signed by defendant Dittman.

50.     On April 15, 2014, Frederick M. Lehrer ("Lehrer"), attorney and counsel at law, filed an attorney letter with OTC Markets Group, Inc., which was published on April 16, 2014 to the investing public, and which stated that Lehrer was retained by the Company to determine whether FusionPharm disclosed adequate current information in its financial reports, including the Restated 2012 and 2013 Annual Reports.[12]

---

[12]     *See* Letter from Frederick M. Lehrer to OTC Markets Group, Inc. (Apr. 15, 2014), *available at* http://www.otcmarkets.com/financialReportViewer?symbol=FSPM&id=118876.

**The Material Omissions and Reasons Why the Statements Were False**

51.     Between approximately February 2013 and April 2013, pursuant to the convertible notes issued to Bayside, Bayside converted debt into 140,000 common shares of FusionPharm and sold them into the market.  In order to facilitate the sales, defendants Sears and Dittman made false statements to brokers and the transfer agent about Bayside's purported non-affiliate status. In addition to the illegality of the Bayside convertible promissory note fraudulent nature – since the loan it purported to memorialize had never been made – the note was also illegal because Bayside's affiliate status also meant that Bayside was required to abide by certain volume restrictions, which it failed to do.  Bayside sold the remainder of its note to an investment group for $250,000 and, based on more false statements from defendants Dittman and Sears, the investors sold shares prior to the expiration of the one-year holding period required by Securities Act Rule 144 [17 C.F.R. § 230.144].  Bayside's proceeds from its sales of FusionPharm stock, as well as the payment from the investors, were ultimately funneled back to FusionPharm using Meadpoint as an intermediary. FusionPharm used proceeds from the Bayside sales of stock and debt to fund its 2013 operations and reported those proceeds as false revenue.

52.     Between approximately March 2013 and April 2014, pursuant to the fraudulent Meadpoint convertible note, Meadpoint converted $42,450 of debt into 4.245 million FusionPharm common shares, and then sold into the market approximately 3.2 million of those shares.  In order to facilitate the sales, defendants Dittman and Sears made false statements to brokers and the transfer agent about Meadpoint's purported non-affiliate status.  In August 2013, Meadpoint also converted $15,000 of fake debt into 1.5 million shares and then sold them to three investors.  The investors received unrestricted shares on the basis of defendants Dittman's and Sears' false representations of Meadpoint's non-affiliate status.  In 2013, Meadpoint's stock sale proceeds and

payments from the investors funded FusionPharm operations. In 2014, Meadpoint's proceeds from its note with FusionPharm were $9.9 million. While some of this amount was transferred to FusionPharm, the majority, $8.7 million, was seized by criminal authorities in May 2014.

53. The above statements in the Company's financial reports during the Class Period were materially misleading and omitted material information because defendants caused the Company to falsely report proceeds from the stock sales as revenue when in fact they were the proceeds of illegal sales of FusionPharm stock by entities controlled by Sears – Microcap, Bayside, and Meadpoint – between April 28, 2011 and May 8, 2014.

54. Throughout the Class Period, defendants caused the Company to issue false and misleading financial reports. In particular, the Company's financial reports failed to disclose that defendants Dittman and Sears transferred unrestricted FusionPharm shares to Sears' controlled entities, who then illegally sold those shares into the market and round tripped some of the proceeds back to FusionPharm. Defendant Dittman then caused FusionPharm to report the illegal sales as revenue and issue false statements about sales of PharmPods in press releases, which in turn maintained and/or increased FusionPharm's stock price and volume, and allowed Sears to sell his FusionPharm stock into the market. The false financial statements and revenue reported by FusionPharm were included in: (1) FusionPharm's 2011 Annual Report (including its financial statements and notes to the financial statements), which was signed by defendant Dittman and posted on the OTC Markets Group Inc.'s website; (2) FusionPharm's 2012 Annual Report, which was signed by defendant Dittman and posted on the OTC website; and (3) FusionPharm's 2013 Annual Report, which was signed by defendant Dittman and posted on the OTC website.

55. FusionPharm also claimed to have sold PharmPods to certain entities affiliated or controlled by Sears, including Meadpoint, and another entity owned or controlled by Sears, but

failed to disclose these transactions, as well as the Bayside and Meadpoint notes, as related party transactions.  FusionPharm's Information and Disclosure Statement for the period ended September 30, 2011, and its 2011 and 2012 annual reports, all signed by defendant Dittman and posted on the OTC website, falsely stated there were no related party transactions. Further, none of FusionPharm's other quarterly reports or its 2013 annual report posted on the OTC website disclosed related party transactions.

## The Truth Begins to Emerge

56.     On May 16, 2014, the SEC issued an Order of Suspension of Trading and suspended FusionPharm from trading on OTC Link for the period May 16, 2014 through May 30, 2014 (the "Suspension Order").[13]  The Suspension Order stated the reason for the suspension of trading against FusionPharm was due to "a lack of current and accurate information concerning the securities of FusionPharm…in filings and disclosures made by FusionPharm on OTC Link…and press releases to investors concerning, among other things: (1) the company's assets; (2) the company's revenues; (3) the company's financial statements; (4) the company's business transactions; and (5) the company's current financial condition."

57.     On this news, the Company's stock plummeted from $2.89 per share at the close of trading on May 15, 2014, the day prior to the issuance of the Suspension Order, to close at $1.10 per share on June 2, 2014, when the Company was allowed to resume trading, a loss of approximately 62% on heavy volume of 767,739 shares.

58.     On September 16, 2016, the SEC issued a press release entitled, "Marijuana-Related Company Charged with Scheming Investors."[14]  The SEC press release stated:

---

[13]     *In the Matter of FusionPharm, Inc.*, File No. 500-1 (May 16, 2014) (Order of Suspension of Trading), *available at* https://www.sec.gov/litigation/suspensions/2014/34-72177-o.pdf.
[14]     SEC release, https://www.sec.gov/news/pressrelease/2016-186.html.

*Washington D.C., Sept. 16, 2016* — The Securities and Exchange Commission today announced fraud charges in a scheme involving illegal stock sales and false financial filings of a company that makes containers for growing marijuana.

An SEC investigation found that William J. Sears orchestrated the scheme along with his brother-in-law Scott M. Dittman, who was the CEO and sole officer at Fusion Pharm Inc. while Sears concealed his control from behind the scenes. ***Sears and Dittman hired Cliffe R. Bodden to help them create fraudulent corporate documents that enabled Fusion Pharm to issue common stock to three other companies controlled by Sears, who then illegally sold the restricted stock into the market for $12.2 million in profits while hiding the companies' connection to Fusion Pharm. Sears transferred some of his illegal proceeds back to Fusion Pharm so the money could be falsely reported as revenue, and the company issued press releases and financial reports that misled investors to believe the revenue came from sales of the containers called PharmPods***.

Sears, Dittman, and Bodden as well as Fusion Pharm and Sears's other three companies agreed to settle the SEC's charges with monetary sanctions to be determined at a later date. The SEC barred Sears and his three companies, Dittman, and Bodden from participating in any future penny stock offerings, and Sears and Dittman are permanently barred from serving as an officer or director of any public company. Dittman also is permanently suspended from appearing and practicing before the SEC as an accountant, which includes not participating in the financial reporting or audits of public companies.

"Sears and Dittman misled investors by recording and trumpeting revenues for purported sales of PharmPods when they were really just round-tripping money from illegal stock sales by hidden affiliates," said Julie K. Lutz, Director of the SEC's Denver Regional Office.

In a parallel action, the U.S. Attorney's Office for the District of Colorado today announced criminal charges against Sears and Dittman.

The SEC separately instituted an administrative proceeding against attorney Tod A. DiTommaso. The SEC Enforcement Division alleges that he issued attorney opinion letters for Sears and Dittman falsely stating that unrestricted shares in Fusion Pharm could be issued into the market when in reality it was restricted stock. The matter will be scheduled for a public hearing before an administrative law judge, who will prepare an initial decision stating what, if any, remedial actions are appropriate.

(Emphasis added.)

59.    Also on September 16, 2016, The Denver Post issued an article entitled,

"FusionPharm owners face federal securities fraud charges."[15]   The article stated:

> The U.S. Attorney's Office for Colorado on Thursday charged Thornton resident William Sears, 50, and his brother-in-law, Scott Dittman, 47, formerly of Elizabeth, with conspiracy to defraud by passing off money from illegal stock sales as product sales.

> The two owned and ran FusionPharm Inc., a Commerce City company that promoted a triple green play — profits from the conversion old shipping containers into greenhouses, primarily to cultivate cannabis, which has struggled with a shortage of indoor space available for commercial-scale grow facilities.

> But the U.S. Securities and Exchange Commission said Friday the two illegally sold restricted FusionPharm shares issued to three companies that Sears controlled, misleading brokers and raising $12.2 million. Some of that money was funneled back to FusionPharm and reported as revenues from the sale of the company's PharmPods containers.

> Investors, duped into thinking the company's financial condition was stronger than it actually was, pushed up the share price, which got as high as $8.70 on March 5, 2014, the SEC said.

*     *     *

> The disputed stock sales and transfers occurred from April 2011 to May 2014.

> Sears, who exercised control of the company from behind the scenes, and Dittman, who was officially the CEO, hired a third person, Cliffe R. Bodden, to help them create fraudulent corporate documents, the SEC said. A Manhattan judge in February 2013 sentenced Bodden to 74 months in prison in a separate scheme to defraud investors.

> Sears, Dittman, and Bodden all agreed to settle the civil charges in return for monetary sanctions that will be determined at a later date, the SEC said. They also agreed to a ban from participating in any future penny-stock offerings.

> Sears and Dittman are permanently barred as serving as an officer or director of any public company and Dittman, who now lives in Pennsylvania, agreed not to work as an accountant on behalf of any public companies, the SEC said.

60.     In the article, Julie Lutz, director of the SEC's Denver regional office, stated:

> Sears and Dittman misled investors by recording and trumpeting revenues for purported sales of PharmPods when they were really just round-tripping money

---

[15]     Aldo Svaldi, *FusionPharm owners face federal securities fraud charges*, The Denver Post (Sept. 16, 2016), *available at* http://www.denverpost.com/2016/09/16/fusionpharm-owners-face-federal-securities-fraud-charges/.

from illegal stock sales by hidden affiliates

61.     As a result of defendants' wrongdoing described herein, the Company's shares traded at artificially inflated prices throughout the Class Period.  When the truth concerning the Company's purported revenue and sales was exposed, the Company's share price plummeted, harming investors.  Since September 16, 2016, the Company's stock has traded around $0.01 per share.

62.     As described above, Sears has pled guilty to a variety of criminal offenses in connection with the above described conduct, for which he agreed to an over $45 million forfeiture and a minimum of 60 months in prison.  Defendant Dittman awaits trial on the same charges.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired FusionPharm securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FusionPharm or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily

used in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

b.   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of FusionPharm;

c.   whether defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   whether the defendants caused FusionPharm to issue false and misleading filings and public statements during the Class Period;

e.   whether defendants acted knowingly or recklessly in issuing false and misleading filings and public statements during the Class Period;

f.   whether the prices of FusionPharm securities during the Class Period were

artificially inflated because of defendants' conduct complained of herein; and

g.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL ALLEGATIONS OF SCIENTER

69.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding FusionPharm, his control over, and/or receipt and/or modification of FusionPharm's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning FusionPharm, participated in the fraudulent scheme alleged herein.

70.   In addition, each of the defendants is the subject of cease-and-desist proceedings and orders with the SEC concerning the false and misleading statements and material omissions described herein (*see supra* notes 2-7).  In connection with the above-described cease-and-desist proceedings, each of the defendants agreed to additional proceedings, including that each

"respondent agrees that he [it] will be precluded from arguing that he [it] did not violate the federal securities laws described in this Order…."  As such, each of the defendants knew of the falsity of the statements described herein.

71.     Furthermore, according to an attorney letter dated April 15, 2014 to OTC Markets Group, Inc. from Frederick M. Lehrer ("Lehrer"), an attorney retained by FusionPharm, defendant Dittman prepared the following unaudited financial statements: (a) unaudited balance sheet for the fiscal year ended December 31, 2013; (b) unaudited profit and loss statement for fiscal year ended December 31, 2013; (c) unaudited statements of cash flow for the fiscal year ended December 31, 2013; and (d) completed information pertaining to the Company with respect to OTC Pink Disclosure Guidelines.  As such, defendant Dittman knew the statements made throughout the Class Period were false and misleading and/or omitted material information with respect to the sales of PharmPods and purported revenue by FusionPharm as he was the sole individual responsible for preparing the Company's financial reports, which were not audited by any independent third party auditor.

72.     Defendant Dittman also knew of the material omissions in the Company's financial reports concerning the related-party transactions involving the entities controlled by defendant Sears, who is defendant Dittman's brother-in-law, as well as the failure to disclose defendant Sears' involvement as an undisclosed officer of the Company throughout the Class Period.

## PRESUMPTION OF RELIANCE ON
## THE FRAUD-ON-THE-MARKET DOCTRINE

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material; FusionPharm securities traded in efficient markets; the Company's shares were liquid and traded

with moderate to heavy volume during the Class Period; the Company traded over-the-counter, and was covered by multiple analysts; the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and Plaintiff and members of the Class purchased and/or sold FusionPharm securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

76. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FusionPharm who knew that the statement was false when made.

## COUNT I

### (Against all Defendants For Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder)

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FusionPharm securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire FusionPharm securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

80.     Pursuant to the above plan, scheme, conspiracy and course of conduct, defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual

reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for FusionPharm securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about FusionPharm's internal quality controls, finances, and business prospects.

81.     By virtue of their positions at FusionPharm, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of FusionPharm securities from their personal portfolios.

83.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.

84.     Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their position of control and authority, defendants were able to and did, directly or indirectly, control the content of the statements of FusionPharm. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to FusionPharm's quality controls, businesses, operations, future financial condition and future prospects.  As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of FusionPharm securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning FusionPharm's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired FusionPharm securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

85.     During the Class Period, FusionPharm securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of FusionPharm securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of FusionPharm securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of FusionPharm securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Individual Defendants participated in the operation and management of FusionPharm, and conducted and participated, directly and indirectly, in the conduct of FusionPharm's business affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information about FusionPharm's misstatement of income and expenses and false financial statements.

90.     As the controlling parties of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to FusionPharm's financial condition and results of operations, and to correct promptly any public statements issued by FusionPharm which had become materially false or misleading.

91.     Because of their position of control and authority, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which FusionPharm disseminated in the marketplace during the Class Period concerning FusionPharm's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause FusionPharm to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of FusionPharm within the

meaning of Section 20(a) of the Exchange Act.  In this capacity, the Individual Defendants participated in the unlawful conduct alleged which artificially inflated the market price of FusionPharm securities.

92.    The Individual Defendants, therefore, acted as a controlling person of FusionPharm.  By reason of their disclosed and undisclosed functional positions of senior management positions of FusionPharm, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, FusionPharm to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the general operations of FusionPharm and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FusionPharm.

94.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 17, 2017                          Respectfully submitted,


                                                   s/ Jeffrey A. Berens
                                                  Jeffrey A. Berens
                                                  BERENS LAW LLC
                                                  2373 Central Park Boulevard, Suite 100
                                                  Denver, Colorado 80238
                                                  Telephone: (303) 861-1764
                                                  Facsimile: (303) 395-0393
                                                  Email: jeff@jberenslaw.com



OF COUNSEL:

LIFSHITZ & MILLER LLP
Joshua M. Lifshitz
Edward W. Miller
821 Franklin Avenue, Suite 209
Garden City, NY 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
Email: jml@jlclasslaw.com
Email: ewm@jlclasslaw.com

### CERTIFICATE OF NAMED PLAINTIFF

I, _Joseph Soliman_____, certify that:

1.    I have reviewed the complaint and authorized its filing or the filing of a Motion for Lead Plaintiff on my behalf.

2.    I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in __FSPM_____ securities that are the subject of this litigation during the class period set forth in the complaint are as follows:

| Security | Date of Transaction | Number of Shares Stating Whether Purchased(P) or Sold(S) | Price Per Share |
|---|---|---|---|
| _FSPM | _03/19/2014_____ | __2000 (P) _____ | _$7.01_____ |
| _FSPM_ | _03/05/2014_____ | __11,000 (P) _____ | _$8.61_____ |
| _____ | _____ | _____ | _____ |

5.    I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Joseph Soliman